BREGEL, Trustee u. w. Loretta M. Julier, ET AL. *v.* JULIER AND BOND, Trustee Under The Inter Vivos Trust Of Genevieve Julier

[No. 178, September Term, 1968.]

*Decided April 3, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SMITH, JJ.

*Wallace Dann* and *Daniel F. Thomas,* with whom were *Albert F. Wheltle* and *Eugene A. Alexander, III,* on the brief, for appellants.

*Richard J. Himelfarb,* with whom were *John J. Ghingher, Jr., Wilbur C. Jensen* and *Weinberg & Green* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

Two fiduciaries (and the remaindermen of their respective trusts) are jockeying litigiously to avoid picking up the tab for the nursing home charges of Miss Genevieve Julier, a maiden lady of 85 and the primary beneficiary of each trust, and the

appeal is by those to whom the chancellor handed the tab and directed its payment from corpus.

Miss Loretta Julier, the sister of Genevieve, had worked for one corporate employer for forty years until her retirement in 1960 and had accumulated an estate worth approximately $53,-000 at her death in 1964, some $25,600 of which she had placed in various banks in her name and that of Genevieve in the usual trust form, the survivor to take the balance. Loretta, and Genevieve who never worked outside the home and had no estate of her own, lived together all their lives, first with their mother and father and then with their father after the mother's death, and finally in a house owned by Loretta, the proceeds of which became part of her testamentary estate. Loretta's will left all of the rest and residue of her estate—some $20,000—in trust "to use the net income therefrom for the care, maintenance and support of my beloved sister, Genevieve Julier, for and during the term of her natural life or so long as she remains unmarried." The will immediately went on to say:

> "I suggest that she reside in and be taken care of by the Jenkins Memorial Hospital, or a convalescent home, whichever she may prefer. My said Trustee shall pay out of said income all monies necessary for her board and medical care, or for anything she may need or desire within reason, my said Trustee to use his judgment and discretion, as I desire her to live with every comfort and privilege compatible with the size of my estate. In the event that the net income is not sufficient for her needs, I then empower my said Trustee to use such part of the corpus of my estate that may be necessary to carry out the intentions of this Trust."

At the termination of the trust one-half of what remains of the corpus is to go to the Little Sisters of the Poor, one-sixth to a nephew, William Cyril Bond, one-sixth to another nephew, William Lloyd Julier, and one-sixth to a niece.

After Loretta's death Genevieve conveyed the $25,600 she had inherited from Loretta, through the joint bank accounts, irrevocably in trust to her nephew, William Cyril Bond (who takes one-sixth of the remainder of Loretta's trust) to "pay

over that portion of the income and/or principal of the Trust as shall be necessary in his discretion to comfortably maintain the Settlor during the term of her natural life." At the settlor's death the remainder is to go to William Cyril Bond.

On November 30, 1964, Genevieve, being then about 80 years old, entered the Mercy Villa nursing home and has since remained there at a cost of $110 a week (said to have increased recently), which has been paid from the income from Loretta's trust and the income and principal (to the extent of some $18,500) from Genevieve's trust.

In November 1967 Genevieve and William Cyril Bond filed a bill in the Circuit Court of Baltimore City, which alleged that despite repeated demands on the trustee of Loretta's trust for principal, he would pay unto Genevieve only net income and that Genevieve's trustee has been forced to invade the corpus of her inter vivos trust to pay her expenses at Mercy Villa, and prayed a declaration that Loretta's trustee be:

> "directed to invade corpus for the benefit of Genevieve Julier to the full extent of her expenses for board and medical care in Mercy Villa Nursing and Convalescent Home since her entry into that institution on November 30, 1964 and to reimburse the inter vivos trust of Genevieve Julier for its expenditures for those expenses."

Loretta's trustee answered that:

> "The Trustee desires to exercise his judgment and discretion in the administration of the trust thoroughly and equitably and to the best interests of all persons interested. The determination of what payments are to be made from the corpus is vested in the Trustee as a discretionary exercise of judgment and to the extent that a justiciable issue is presented as to the manner in which the Trustee must exercise his discretion, a Declaration by this court would be advisable."

William Lloyd Julier answered that Loretta's trustee had acted properly and denied "that William Cyril Bond should be permitted to exhaust the corpus of the trust under the will of

[Loretta] in which he has a one-sixth interest, and to preserve the corpus of the trust under the inter vivos deed in which he possesses a 100% interest in the remainder."

Genevieve and Bond, her trustee, moved for summary judgment. The affidavit of Loretta's trustee in opposition recited:

> "That I knew Loretta M. Julier for a number of years and personally discussed with her the preparation of her Last Will and Testament which was executed on August 31, 1955. That the money in the trust accounts which passed to the Plaintiff, Genevieve Julier at the death of Loretta M. Julier was derived from the Testatrix's own funds and she regarded this money as part of her estate and when she considered her sister Genevieve's needs considered not only her own probate estate, but the money contained in the trust accounts which passed to her sister, Genevieve.
>
> "I have determined in the exercise of my discretion that payments from the principal of the trust under the Will of Loretta M. Julier should not be made as requested by the Plaintiff, William Cyril Bond. I have determined as a fact that it would be in the best interests of all parties for me to take into consideration the sources available to Genevieve Julier from her own private means before invading the principal of the trust under the Will of Loretta M. Julier.
>
> "I have the responsibility of determining whether or not the resources under my command are sufficient in light of all the circumstances to warrant the expenditure by me of $110 per week plus other ancillary expenditures.
>
> "Among the facts I have to take into consideration, and do take into consideration, is that the funds forming a part of the Trust under the Will of Loretta M. Julier, may be exhausted prior to Genevieve Julier's death."

There was a report and recommendation by the Master in Chancery which said:

> "In the instant suit we have a question posed by a

classical but seldom settled problem. The beneficiary
of the trust here has some assets of her own and there
is a duty upon the trustee to provide for her mainte-
nance. As pointed out In re: *Martin's Will,* 269 N.
Y. 305, 199 N. E. 491, 494, quoted in *Washington Col-
lege, supra* [186 Md. 89] at page 95 'The primary
question in this class of cases always is: does the will
constitute an absolute gift of support and maintenance
which it makes a charge upon the income from the es-
tate and upon principal, if so then the private income
of the beneficiary cannot be considered. If, however,
the gift is of income coupled with a provision that the
principal may be invaded in case of need, the private
income of the beneficiary must be considered in deter-
mining whether such need exists,' "

and his conclusion was:

"Most of the cases cited in the annotation [2 A.L.R.
2d 1383 at 1431, Part VI, § 26 of an annotation en-
titled 'Trust provisions for payment, in the trustee's
discretion or for a designated purpose, of part or all
of the principal to a beneficiary'] as well as most of
the cases generally to be found on the subject, give to
the trustee a discretion to invade the corpus in the
event the income is insufficient for the purpose of the
trust. Such cases are not apposite here. In the instant
case the discretion is given as to the expenditure of in-
come, apparently when the income is in excess of need,
but no discretion is given when there is necessity to
invade the corpus for the purpose stated in the trust."

Judge Cullen, adopting the opinion of the Master gave sum-
mary judgment for Genevieve and her trustee Bond and further
ordered that Loretta's trustee:

"is directed to invade the corpus of that trust for the
benefit of Genevieve Julier to the full extent of her
expenses for board and medical care in Mercy Villa
Nursing Home or such other Nursing Home in which
she may reside, and is also directed to reimburse Wil-

liam C. Bond, Trustee under the *inter vivos* trust of Genevieve Julier, for all expenses heretofore incurred for her board and medical care in Mercy Villa Nursing Home since November 30, 1964 * * *."

The Master's choice of the controlling law was sound but his analysis of the intent and effect of Loretta's will was only partially perceptive and this led him to an unsound conclusion, and Judge Cullen in following him gave summary judgment for the wrong parties.

The need to decide whether a trustee who, under the governing instrument, may invade corpus for the benefit of an income beneficiary, properly may consider the other resources of the beneficiary in determining whether or to what extent to invade has been presented to this Court twice before, first in *Washington College v. Safe Deposit and Trust Co.*, 186 Md. 89, and next in *Offutt v. Offutt,* 204 Md. 101. In both the Court, applying established rules, found in effect (a) the intention of the testator to have been to give the trustee discretion as to the invasion of corpus which encompassed the right to take into account the independent means of the beneficiary, and (b) no need to invoke an exception to the general rule that where a trustee is given discretion the exercise of that discretion will not be judicially controlled absent an abuse of that discretion flowing from dishonesty, an improper though not dishonest motive, failure to exercise judgment or an exercise clearly beyond the bounds of a reasonable judgment.

In *Washington College* Judge Henderson for the Court referred to the standard test used to decide on which side of the line the testator or settlor has written—whether he has made an absolute gift of "support and maintenance" charged on income or principal or both, or whether he has made a gift conditioned upon the trustee's determination of need. The facts in *Washington College* had significant similarities to those in the case before us. There the husband had placed various of his holdings worth $40,000 in the joint names of himself and his wife. His will created a trust of his estate of $78,000 under which the widow got the income for life with remainder to Washington College. There was a further clause which recited

that the giving of a life estate to the wife rather than an absolute estate had been at her request, and added:

> "It seems to me that she is not too amply provided for; and if she needs any of the corpus of this trust estate for living purposes, I hereby request and empower my said trustees * * * to pay to my said wife * * * such sums from said corpus for living purposes as to their judgment may seem best."

The widow's expenses were $7,200 a year and the aggregate income from the trust and her separate estate was but $5,900. She asked the trustees to supply her the income deficit of $1,300 a year so as to permit her to preserve her own principal. The Court held:

> 'The use of corpus was restricted by the condition 'if she needs any of the corpus of this trust estate for living expenses;' the power to invade corpus was only conferred because 'it seems to me she is not too amply provided for.' We think the latter expression refers to her total resources, not merely to the trust estate. He was fully aware of her separate estate and resources, and by placing $40,000 worth of investments in their joint names, he amplified her absolute estate to that extent, although not required to do so under the terms of the antenuptial agreement. The choice of a spend-thrift trust of his residuary estate was deliberate and for her own protection against emergency, and particularly against the hazards of investment losses that were so prevalent at the time the will was executed, in December, 1932. The trustees, of course, have no control over the management or use of her separate estate; it is only by conserving the trust corpus for possible future needs that the testator's purpose can be given its full effect." [186 Md. at pp. 96-97]

In *Offutt* a son, at his majority, received the proceeds of life insurance policies on his deceased father's life in the amount of $69,000. The trustees under the father's will, holding some $369,000 in assets which produced an income of some $10,000,

took into consideration the income the son's own $69,000 produced and under a provision which gave them absolute discretion as to what income of the trust was "necessary and desirable for his support and maintenance," paid him $200 a month of the trust income. The son sought an increase to $300 a month and the lower court ordered it paid. This Court reversed. The holding was:

> "The intention of the settlor must be looked to in determining whether the trustees committed an abuse of discretion in considering the beneficiary's independent resources when they fixed the amount of the allowance for support and maintenance.
>
> * * *
>
> "The monthly allowance to be received by the appellee is not an absolute gift of support and maintenance but is only so much of the income of the trust as the trustees 'may deem necessary and desirable for his support and maintenance.' The settlor, aware that appellee would at the age of twenty-one come into possession of government bonds and of life insurance proceeds totalling about $69,000, might understandably feel no compulsion to provide for appellee an absolute gift from the annual trust income but might well leave the amount to the judgment of the trustees, who could vary the amounts with any change in circumstances.
>
> "In determining the necessity and desirability of the monthly allowance, the trustees were within their power of discretion in giving consideration to appellee's independent sources of income." [204 Md. at pp. 110-111]

Sitting in Loretta's armchair, her testamentary intent becomes clear. She was leaving $20,000 in trust to provide for a sister she had supported for years, a sister who had no financial resources of her own other than the $25,600 Loretta was to leave her outright. $20,000 could be expected to produce $800 a year income, at most $1,000. Genevieve would need nursing home care, an expense that $1,000 a year could not come close to paying. The excess cost could come only from Genevieve's

$25,600 or the corpus of Loretta's trust. No one could tell how long Genevieve would live to require nursing home care. Loretta therefore provided that the income should first go to provide the prescribed minimum of "board and medical care." If by any chance all of the income was not, for any period, needed for board and medical care, the trustee, taking into account the size of the trust estate, should consider Loretta's desire that Genevieve should be furnished "every comfort and privilege." If net income—as it almost inevitably would—proved insufficient "for [Genevieve's] needs" Loretta "empowers" her trustee to expend as much of the corpus as may "be necessary to carry out the intentions of this trust." The "intentions of this trust" were that, as long as Genevieve should live or remain unmarried she should have nursing home board and medical care to the extent the trust estate and her individual estate could provide it and to accomplish this, the testamentary trustee was given the power and right to weigh Genevieve's "needs"— a relative term and concept—and discretion as to when and to what extent corpus should be invaded for those needs.

The word "empower" in some contexts may have a mandatory connotation but its ordinary and natural import is that of permission rather than command. *Welsh v. Spillane* (Mass.), 43 N.E.2d 2, and *Dunklee v. Kettering* (Colo. en Banc), 225 P. 2d 853, citing *Washington College, supra*. We think that in Loretta's will the word imports permission and that it would be meaningless under the circumstances of this case unless it gave the trustee discretion to decide whether Genevieve's needs can be satisfied by the use of her own resources and empowers him not to satisfy them from testamentary corpus as long as they can otherwise be satisfied. It is equally plain that Loretta contemplated that if Genevieve's needs can be satisfied only by the use of testamentary corpus they must be so satisfied, but that in deciding what her "needs" are for any particular period the testamentary trustee can determine under the financial trust picture at that time whether proper and comfortable board and competent medical care could not be offered at less cost than is currently required. Only in this way can Loretta's primary intention, to have her trust care for Genevieve as long as she lives, as comfortably as is practicable, be gratified.

We think the conclusions we reach are called for under *Washington College* and *Offutt,* the cases they cite and other authorities which sustain their holdings, such as Restatement *Trusts 2d* § 128 i, p. 279, and § 187, p. 402 *et seq.*; 2 *Scott on Trusts* (3rd Ed.), §§ 128.4 and 128.7; *In re Ferrall's Estate* (Cal. in Bank), 258 P. 2d 1009; *Frey v. Greenberg* (Conn.), 202 A. 2d 142; *In re Tuthill's Will* (Minn.), 76 N.W.2d 499; *Munsey v. Laconia Home for the Aged* (N.H.), 164 A. 2d 557; *Sibson v. First Nat. Bank and Trust Co. of Paulsboro* (Super. Ct. N.J.), 165 A. 2d 800; and *In re Seacrist's Estate* (Pa.), 66 A. 2d 836.

> *Judgment reversed and case remanded for a summary declaration in accordance with the views hereinabove expressed; the costs, including a fee to the lawyer for the testamentary trustee, which reflects the smallness of the source from which the fee is to come, shall be paid from the inter vivos trust.*